**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Robert Paul SARRO, John Michael Tiedeberg, James Gennaro Tortoriello, Defendants-Appellants.**

**No. 83–5266.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 27, 1984.

Rehearing and Rehearing En Banc Denied Dec. 13, 1984.

Tjoflat, Circuit Judge, filed concurring and dissenting opinion.

28.

H. Dohn Williams, Jr., Williams & Gulkin, P.A., Hollywood, Fla., for Sarro.

Steven E. Kreisberg, Stephen M. Pave, Miami, Fla., for J.G. Tortoriello.

Bruce Zimet, Linda Collins Hertz, David Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Theodore Sakowitz, Federal Public Defender, Robyn J. Hermann, Asst. Federal Public Defender, Miami, Fla., for Tiedeberg.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA *, Senior Circuit Judge.

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

HATCHETT, Circuit Judge:

Appellants, Robert Sarro, James Tortoriello, Jr., and John Michael Tiedeberg, appeal their conviction for conspiracy to transport in interstate commerce two paintings valued at $5,000 or more, knowing the paintings to have been stolen, in violation of 18 U.S.C.A. § 371 (West 1966), and 18 U.S.C.A. § 2314 (West 1970). We affirm the convictions of Robert Sarro and James Tortoriello, Jr., but we reverse the conviction of John Michael Tiedeberg.

### Facts

In July, 1982, Federal Bureau of Investigation (FBI) Agents Brown and Hanlon sought to recover two paintings which had been stolen two years earlier. On July 28, 1982, Agent Hanlon, in his undercover capacity, telephoned Phillip Shapiro. During the conversation, Shapiro told Hanlon that two paintings by the famous artist Rubens were in the Fort Lauderdale, Florida, area and could be purchased for $1 million each. Agent Hanlon told Shapiro that he was interested if the paintings could be authenticated by an appraiser. Agent Hanlon and Shapiro agreed to meet on July 29, 1982, at the Marriott Motor Hotel in Fort Lauderdale. Agent Hanlon tape recorded this telephone conversation.

On July 29, 1982, Agents Hanlon and Brown met with Shapiro and two other men at the Marriott Motor Hotel. At this meeting, Shapiro informed the agents that two paintings by the artist Rubens were available for $1 million each. Shapiro further stated that the paintings had been "boosted" in a burglary in south Florida, and persons known to him were in possession of the paintings and were seeking a buyer. Agent Hanlon responded that he knew some South and Central American individuals who were in possession of large sums of cash and who were looking for investments. In addition, Hanlon stated that the only problem he could foresee with the purchase of these paintings would be authenticating them as originals. Agents Brown and Hanlon tape recorded this meeting.

On July 30, 1982, Agents Hanlon and Brown met Shapiro at the Bagel Joint in Fort Lauderdale. At that time, Shapiro indicated that a meeting had been arranged for Agents Hanlon and Brown to meet with the individuals who had actually "boosted" the paintings. Shapiro scheduled this meeting for later that same afternoon at the River Watch Lounge in the Marriott Motor Hotel.

At the lounge, Shapiro introduced the agents to Mark Tortoriello and appellants, James Tortoriello, Jr. and Robert Paul Sarro. Then, Mark Tortoriello handed Agent Hanlon a grocery bag containing two paintings wrapped in a towel. Hanlon asked Mark Tortoriello if they could move to a more secluded place to examine the paintings.

The group, consisting of appellant, James Tortoriello, appellant, Robert Paul Sarro, Mark Tortoriello, Shapiro, and Agents Brown and Hanlon, then moved to a table at the rear of the lounge. The agents then closely examined the paintings. The agents then explained to James Tortoriello, Sarro, Shapiro, and Mark Tortoriello that the paintings were impressive, and if they were authentic, the agents could find a buyer.

James Tortoriello responded that the two paintings were worth $1 million each and that the paintings were stolen from the Whitney house in Palm Beach County approximately two years earlier. James Tortoriello further stated that the paintings had been in his possession since that time, and that he had researched their approximate value.

The agents informed the men that the paintings needed to be authenticated by their art expert who lived in New York, and that once the paintings were authenticated, the agents had some Latin American clients who would be interested in purchasing them. The agents explained that the paintings would be taken from the United States to their clients' residences in South or Central America, where they would be hung without fear of detection.

James Tortoriello stated that he would travel anywhere to have the paintings appraised, or for the sale, but he would not relinquish control of the paintings prior to their sale.

The parties agreed that after the appraiser or art expert verified the paintings' authenticity, the paintings would be taken to one location and held, along with one of the buyer's representatives, and then the buyer or another of his representatives would go to another location with the money. After the money was exchanged, a telephone call would be made, and the paintings would be released to the buyer or his representative.

Near the end of this meeting, appellants, Robert Sarro and James Tortoriello, requested that the agents find a purchaser for the paintings as soon as possible, and urged that the deal be completed within a two-week period. This meeting adjourned with the understanding that another meeting would be held on August 1, at the Fort Lauderdale Holiday Inn.

On August 1, 1982, Agents Hanlon and Brown arrived at the Airport Holiday Inn and met with Shapiro. Hanlon informed Shapiro that his art expert/appraiser would be available to look at the paintings on August 4, 1982, in Hartford, Connecticut. Shapiro indicated that he would ask "Mr. Tortoriello" and his group about this arrangement, and advise Hanlon later. This meeting terminated without a firm time or place being set for the art appraisal. Agents Hanlon and Brown tape recorded this meeting.

On August 2, 1982, Agent Hanlon and Shapiro had a telephone conversation concerning movement of the paintings from Florida to New York for authentication. Connecticut was also a possible site for the paintings' appraisal.

During one of these telephone conversations, Shapiro stated that the "big guy was afraid to fly," so Hanlon would have to bring his appraiser to Florida. In any event, plans for the New York or Connecticut appraisal fell through, and the appraisal was later scheduled to take place in Fort Lauderdale, Florida.

On August 4, 1982, FBI Agent Thomas M. McShane, working undercover as an art expert, met Shapiro in the lobby of the Marriott Hotel in Fort Lauderdale. At that time, Shapiro informed McShane that his "people" had not yet arrived. McShane told Shapiro that he was pretty exhausted because at the last minute, the appraisal plans were changed. Shapiro apologized for the rearrangement of plans, and explained that at the last minute, one of the people in his party decided that he did not want to fly to New York. According to Shapiro, the person was afraid of flying.

Shapiro informed Agent McShane that he would have to be searched before the deal went through. Agent McShane stated that he would cooperate fully and that Shapiro could also search his hotel room. Agent McShane then returned to his hotel room to shower and shave.

Soon thereafter, Shapiro and appellant, John Michael Tiedeberg met with McShane in his hotel room. Upon entering, Tiedeberg searched McShane and then searched his room. After the searches, Shapiro asked Tiedeberg if he were satisfied, and Tiedeberg nodded his head in affirmance. Shapiro then told Tiedeberg to stay in the room with McShane; Shapiro left the room.

Shortly after Shapiro left the room, Tiedeberg answered a knock at the hotel room's door. Shapiro and appellant, Sarro, entered the room. Shapiro carried a brown shopping bag containing the paintings.

At this point, Agent McShane began to check the paintings for size, medium, and condition. During this examination, Sarro, Tiedeberg, and Shapiro were standing next to McShane. Agent McShane went into the bathroom with the paintings so he could closely examine them with a black light. Tiedeberg accompanied Agent McShane into the bathroom.

At the end of his examination, McShane reentered the room and told Shapiro, Sarro, and Tiedeberg that the paintings looked very good and that they could be Rubens. Agent McShane then asked if the paintings were "hot," and Shapiro stated that they

were "out for two years." Sarro interrupted and stated that the paintings "had been out for seven years" instead of two.

Agent McShane then informed the parties that the paintings would have to be taken to New Jersey and eventually would be going to a customer in Central America. Shapiro asked Agent McShane how the money would be transferred. McShane stated that they could "do it here or do it in New York." Shapiro said it did not matter.

Agent McShane asked Shapiro and Sarro if they would accompany him to the lobby and help him retrieve his x-ray machine. Sarro and Shapiro consented. Prior to leaving, Shapiro ordered Tiedeberg to remain in the room with the paintings. Once outside the hotel room, law enforcement officers arrested Sarro and Shapiro.

A few minutes later, Agent McShane returned to his hotel room and found it empty. McShane went onto the balcony and observed a brown paper bag with the paintings in it in the bushes directly below the balcony. Agent McShane did not see Tiedeberg.

Shortly thereafter, appellant, James Tortoriello, telephoned Agent McShane, and they agreed to meet in the hotel lounge to further discuss the sale of the paintings.

Agent McShane went to the lounge where he and James Tortoriello discussed the paintings and their value. During the discussion, Tortoriello emphasized that the paintings were taken two years ago from the Whitney estate.

Among the many things discussed was payment for the paintings. James Tortoriello agreed that the money exchange could take place in New York.

Agent McShane informed Tortoriello that it was McShane's responsibility to convince his principal that the paintings were authentic and that McShane also bore the responsibility of getting the paintings out of this country into South or Central America. Agent McShane informed Tortoriello that before the paintings went to South or Central America, they would be going to New Jersey.

Tortoriello further informed McShane that although Sarro, Tiedeberg, and Shapiro were his men, "when the deal finally went down," McShane would be dealing with James Tortoriello concerning the money. When Agent McShane gave a pre-arranged signal, law enforcement officers arrested McShane and James Tortoriello.

## Procedural History

On August 11, 1982, a federal grand jury returned a one-count indictment charging Robert Sarro, James Tortoriello, Jr., and Mark Tortoriello with conspiracy to transport in interstate commerce two paintings of a value of $5,000 or more, knowing the paintings to have been stolen, in violation of 18 U.S.C.A. § 371 (West 1966), and 18 U.S.C.A. § 2314 (West 1970). Later, a superseding indictment was filed adding appellant John Michael Tiedeberg, charging him with the same offenses.

Appellants (Mark Tortoriello died before trial) were tried in a joint trial. At the close of the government's case and at the close of all the evidence, appellants moved for judgment of acquittal. The district court denied these motions.

The jury returned verdicts of guilty against Shapiro, Sarro, Tiedeberg, and Tortoriello. The district court entered judgment against appellants and sentenced them. Sarro, Tortoriello, and Tiedeberg appeal.

## Issues

On this appeal we must consider five main issues: (A) whether the district court abused its discretion in admitting into evidence tape recordings of two key meetings; (B) whether sufficient evidence existed to sustain the conviction of appellants, James Tortoriello, Jr. and Robert Sarro; (C) whether the indictment was constructively amended; (D) whether sufficient evidence existed to sustain the conviction of appellant, John Michael Tiedeberg; and (E) whether appellant, Robert Sarro, was denied his statutory right to a speedy trial following his indictment.

## Discussion

### A. Admissibility of Tape Recordings

Appellant, Sarro, contends that the district court abused its discretion when it allowed the government to play the taped recordings of two key meetings without properly authenticating the tapes. At trial, the government introduced two tape recordings of two different in-person meetings that Agent Hanlon had with Shapiro. The first recording was of the July 29, 1982, meeting that Hanlon had with Shapiro at the Fort Lauderdale Marriott Hotel. The second recording was of the meeting that Agent Hanlon had with Shapiro at the Fort Lauderdale Holiday Inn on August 1, 1982.

Determinations of admissibility of evidence rest largely within the discretion of the district court and will not be disturbed on appeal absent a clear showing of an abuse of discretion. *United States v. Russell,* 703 F.2d 1243 (11th Cir.1983). In *United States v. Biggins,* 551 F.2d 64 (5th Cir.1977), the former Fifth Circuit stated that the trial court has broad discretion in determining whether to allow a recording to be played before the jury. *Biggins,* 551 F.2d 64.

Sarro contends that the tape recordings of the July 29, 1982, and August 1, 1982, meetings were not properly authenticated and, therefore, should have been excluded from evidence. It is well settled law that the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show that the recording is an accurate reproduction of the conversation recorded. *See United States v. Bright,* 630 F.2d 804 (5th Cir. 1980); *see also United States v. Biggins,* 551 F.2d 64 (5th Cir.1977). In resolving this evidentiary dispute, we first must decide whether the government met its burden of proof.

In order to authenticate a taped recording, the government, in a criminal case, must show: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers. *Biggins,* 551 F.2d at 66.

At trial, Agent Hanlon testified that he and Agent Brown attended the meetings with co-defendant Shapiro and that Hanlon recorded the relevant conversations. Prior to introducing the audio cassette tape recordings into evidence, the government proffered testimony that: (1) Agent Hanlon was familiar with the Nagra recording device that was used to tape the relevant meetings; (2) that the Nagra recording device was functioning properly on both July 29 and August 1, 1982; (3) that the audio cassette tapes were an accurate reproduction of the meetings on July 29, 1982, and August 1, 1982; (4) that nothing had been added to or deleted from the audio cassette tapes of the relevant meetings; and (5) that the audio cassette tapes had been documented and transferred through a complete chain of custody.

Once the *Biggins* foundation was laid, appellant had the burden of rebutting it. *United States v. De La Fuente,* 548 F.2d 528, 533–34 (5th Cir.1977). The only semblance of evidence adduced to challenge the admission of the aforementioned tape recordings was appellant's contention that Agent Hanlon had not listened to the original Nagra tape recordings prior to testifying as to the authenticity of the audio cassettes. Such evidence is not sufficient to dismantle the government's properly laid *Biggins* foundation. We conclude that appellant failed to rebut the government's competent evidence of the tapes' authenticity.

Furthermore, the *Biggins* court stated:

If there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward.

*Biggins,* 551 F.2d at 67. Even if the government failed to carry its particularized burden of going forward, the fact that Agent Hanlon was actually present at both meetings evidences his competency to testify at trial that the audio cassettes played in court were accurate reproductions of those meetings. We hold that the district court properly admitted the tape recordings.

B. Sufficiency of the Evidence to Sustain the Convictions of Appellants Tortoriello and Sarro

Appellants, James Tortoriello, Jr. and Robert Sarro, contend, among other things, that the government failed to prove beyond a reasonable doubt that they conspired to transport two stolen paintings worth $5,000 or more in interstate commerce, in violation of 18 U.S.C.A. § 371 (West 1966) and 18 U.S.C.A. § 2314 (West 1970). Tortoriello and Sarro, therefore, argue that the district court erred in denying their motions for judgment of acquittal.

■ In reviewing the sufficiency of the evidence to support a criminal conviction, the standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In assessing the sufficiency of the evidence, we must view the evidence together with all reasonable inferences in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ A conviction must be reversed "if a reasonable jury must necessarily entertain a reasonable doubt as to the defendant's guilt." *United States v. Marx,* 635 F.2d 436, 438 (5th Cir.1981). Furthermore, the former Fifth Circuit has held that:

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. [Footnote omitted.] A jury is free to choose among reasonable constructions of the evidence. *United States v. Bell,* 678 F.2d at 549.

We, therefore, must decide whether a reasonable trier of fact could find that the evidence establishes beyond a reasonable doubt that Sarro and Tortoriello conspired to violate 18 U.S.C.A. § 2314 (West 1970).

■ The law of conspiracy protects "society from the dangers of concerted criminal activity" and "identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it." *United States v. Feola,* 420 U.S. 671, 693–94, 95 S.Ct. 1255, 1268–1269, 43 L.Ed.2d 541 (1975); *United States v. Beil,* 577 F.2d 1313 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

■ A conspiracy and the related substantive offense which is the object of the conspiracy are separate and distinct crimes. *United States v. Romeros,* 600 F.2d 1104 (5th Cir.1979), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Moreover, an illegal conspiracy is complete regardless of whether the crime agreed upon is actually consummated. *United States v. Feola,* 420 U.S. at 693–94, 95 S.Ct. at 1268–1269.

■ Thus, the fact that Sarro and Tortoriello did not actually transport stolen paintings worth $5,000 or more in interstate or foreign commerce does not free them from the penalty of their illegal conspiracy to do so.

■ To support a conviction of conspiracy, the government must prove an agreement to commit an unlawful act and an overt act by one of the conspirators in furtherance of the conspiracy. *United States v. Tombrello,* 666 F.2d 485, 490 (11th Cir.1982), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. Wieschenberg,* 604 F.2d 326 (5th Cir.1979).

Title 18 U.S.C.A. § 2314 (West 1970) provides, in pertinent part: "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... shall be fined not more than $10,000 or imprisoned not more than ten years or both."

Title 18 U.S.C.A. § 371 (West 1966) provides, in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

We must sustain the convictions of appellants, Sarro and Tortoriello, if a reasonable trier of fact could find that the evidence presented at trial establishes appellants' guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

■ The evidence in this case, viewed in the light most favorable to the government, supports the convictions of Sarro and Tortoriello. On July 29, 1982, Shapiro informed Agents Brown and Hanlon that he had two paintings by the artist, Rubens, which were stolen from a south Florida residence and which were available for sale at $1 million each. In response, Agent Hanlon told Shapiro that he knew people in Central and South America with large amounts of money who were looking for places to invest their money. On July 30, 1982, Shapiro told Agents Brown and Hanlon that he had arranged for the agents to meet with the people who had actually stolen the paintings.

At the appointed time, the agents went to the River Watch Lounge where they met Shapiro. Shapiro then introduced the agents to Mark Tortoriello and appellants, James Tortoriello and Robert Sarro. Mark Tortoriello handed Agent Hanlon a bag which contained two paintings wrapped in a towel.

After examining the paintings, Agents Hanlon and Brown told James Tortoriello and Sarro that the agents could obtain a buyer for the paintings if they were authentic. James Tortoriello informed the agents that the paintings were worth $1 million each and that they had been stolen from the Whitney home in Palm Beach County approximately two years earlier.

James Tortoriello further stated that since the time of the theft, the paintings were in his possession and during that time he had researched their approximate value and titles. He told the agents the titles of the paintings. The parties present set another meeting for August 1, 1982, at the Airport Holiday Inn in Fort Lauderdale, Florida.

As scheduled on August 1, 1982, the agents met with Shapiro. During this meeting, the parties discussed authentication of the paintings and Agent Hanlon informed Shapiro that his art expert would be available to look at the paintings on August 4, 1982, in Hartford, Connecticut. Shapiro told the agents that he would have to contact his group about these arrangements and that he would get back to them later.

During the time that elapsed between August 1, 1982, and August 4, 1982, the plans for the authentication to take place in both New York and Connecticut fell through, and Agent Hanlon arranged for Agent McShane, working undercover as an art expert, to examine the paintings in Florida.

On August 4, 1982, Agent McShane, working under cover as an art expert, met Shapiro in the lobby of the Marriott Hotel in Fort Lauderdale, Florida. Agent McShane then returned to his hotel room. Shortly thereafter, Shapiro and appellant, Tiedeberg, went to McShane's hotel room and were invited inside.

After entering, Tiedeberg searched Agent McShane and then searched his room. Shapiro left the room and returned

shortly with a bag which contained the paintings. Sarro accompanied Shapiro.

Agent McShane examined the paintings in his hotel room. Present during the examination were Shapiro, Sarro, and Tiedeberg. At the end of the examination, Agent McShane asked if the paintings were "hot paintings," and Shapiro stated that they were "out for two years." Sarro interrupted that "they had been out for seven years." Tiedeberg did not contribute to this conversation. During this conversation, Agent McShane stated that the paintings would have to be taken to New Jersey and eventually would be going to a customer in Central America.

Later that day, Agent McShane and appellant, Tortoriello, agreed to meet in the hotel lounge to further discuss acquisition of the paintings. They specifically discussed that the paintings were $1 million each, and appellant, Tortoriello, agreed that the money exchange could take place in New York. Tortoriello added that although Sarro, Tiedeberg, and Shapiro were his men, McShane would be dealing directly with him concerning the money for the paintings.

Given this extensive involvement on the part of appellants, James Tortoriello and Robert Sarro, it is clear that they conspired to transport in interstate commerce two Rubens paintings of a value of $5,000 or more, knowing the paintings to have been stolen, in violation of federal law.

Evidence that appellants believed the paintings to be stolen is generously supplied by appellants' own statements to the agents. The jury believed the agents' testimony. Credibility determinations and weight of evidence evaluations are left with the jury. *U.S. v. Molinares*, 700 F.2d 647, 650 (11th Cir.1983).

Ample evidence exists to support the conclusion that appellants, Sarro and Tortoriello, fully intended to transport stolen property worth more than $5,000 in interstate commerce.

After agreeing to this unlawful plan, the conspiracy was complete when the first

overt act was perpetrated to advance its cause. The record reveals that co-conspirator Shapiro accompanied by appellant Sarro delivered the stolen paintings to Agent McShane. Thus, an overt act in furtherance of the illegal scheme occurred.

We conclude that a reasonable trier of fact could find that the evidence presented at trial established beyond a reasonable doubt the guilt of Sarro and Tortoriello. *United States v. Bell*, 678 F.2d at 549. We, therefore, hold that the evidence was sufficient to convict appellants of conspiracy to transport in interstate commerce two paintings of a value of $5,000 or more, knowing the paintings to have been stolen.

**C. Whether the Indictment was Constructively Amended**

Appellant, Tortoriello, raises a trilogy of arguments; all of which are without merit. Tortoriello claims that the government and the trial court altered the offense charged in the indictment to such an extent that the alteration constituted an impermissible constructive amendment of the indictment. Tortoriello alleges this is true because: (1) the trial court did not require the government to prove that the two paintings had an actual value of $5,000 or more; (2) the government did not prove that the paintings were in fact stolen; and (3) the subjects of the conspiracy were not paintings as charged in the indictment, but rather "actual drawings."

To this trilogy, appellant, Sarro, adds that the government failed to prove that appellants agreed that the paintings be transported in interstate commerce. We address each contention in turn.

*1. Actual Value of the Paintings*

Appellants' argument that the district court altered the offense charged in the indictment when it instructed the jury that the government did not have the burden of proving that the paintings were actually worth $5,000 is without merit. While proof that the paintings had a minimum value of $5,000 would have been necessary had appellants been charged with a substantive violation of section 2314, that proof is un-

necessary here because appellants were charged with conspiracy to violate section 2314. *United States v. Graves*, 669 F.2d 964, 971 (5th Cir.1982); *United States v. Maddox*, 492 F.2d 104, 106 (5th Cir.), *cert. denied*, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974).

■ Federal jurisdiction over the substantive offense of transportation of stolen goods in interstate commerce is predicated on the goods having a value of at least $5,000. 18 U.S.C.A. § 2314; *United States v. Tombrello*, 666 F.2d 485 (11th Cir.1982).

This court, however, has expressly held that proof of the conspirator's *belief* that the illegal activity would yield more than the jurisdictional amount, $5,000, is all that is required to sustain a conspiracy conviction. *Tombrello*, 666 F.2d at 489; *accord United States v. Rosner*, 485 F.2d 1213 (2d Cir.1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

■ The evidence reveals that appellants believed that they would reap $2 million from their sale of stolen paintings. Under *Tombrello*, appellants' belief covers the jurisdictional amount. Appellants' argument to the contrary overlooks the jurisprudential distinction between a conspiracy and the substantive offense. We hold that the district court correctly instructed the jury with regard to the value of the paintings.

### 2. Interstate Commerce

■ Contrary to appellants' contentions, the district court correctly instructed the jury that the government did not have to prove that the paintings actually traveled in interstate commerce. Proof that goods actually traveled in interstate or foreign commerce is unnecessary when a defendant is charged with conspiracy to violate 18 U.S.C.A. § 2314. *United States v. Franklin*, 586 F.2d 560, 567 n. 12 (5th Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979); *United States v. Rose*, 590 F.2d 232, 235–36 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979); *accord*

*U.S. v. Graves*, 669 F.2d 964, 971 (5th Cir. 1982).

In *Franklin*, a witness testified that it was mentioned at the May 26 Piere House meeting that the Audubon folios would be going "up north" after the robbery. *Franklin*, 586 F.2d at 567 n. 12. Based on this testimony, the former Fifth Circuit concluded that a jury could reasonably infer that the appellant co-conspirators, both of whom attended the meeting, knew that the stolen art would be transported interstate. *Franklin*, 586 F.2d 567 n. 12.

The present record reveals that on August 4, 1982, appellant, Tortoriello, met with Agent McShane. During this meeting, Agent McShane advised Tortoriello that McShane had the responsibility of getting the paintings out of the country, but before the paintings left the United States, they would be going to New Jersey. Tortoriello said that the money exchange for the paintings could be done in New York.

Prior to that meeting with Tortoriello, Agent McShane examined the paintings and engaged in conversation with Shapiro, Sarro, and Tiedeberg. During this conversation, the parties discussed the fact that the paintings had to be transported to New Jersey and then eventually to a customer in Latin America. Shapiro asked how the money would be transferred. Agent McShane told Sarro, Shapiro, and Tiedeberg that they could make the exchange "here or do it in New York." Shapiro said it did not matter.

■ After reviewing this evidence in a light most favorable to the government, we conclude that the jury could reasonably infer that Tortoriello and Sarro, both of whom attended the relevant meetings, knew, agreed, and believed that the stolen art work would be transported interstate. *See United States v. Franklin*, 586 F.2d at 567. We hold that the district court correctly instructed the jury that the government was not required to prove that the stolen paintings actually traveled in interstate commerce.

### 3. Proof That the Paintings Were Actually Stolen

Appellants further contend that the evidence is insufficient to support their convictions because the government did not prove that the paintings were actually stolen, and that this problem was compounded when the judge instructed the jury that "the government does not have any burden of proving that the paintings in this case were stolen."

We agree with the trial court that the government did not have to prove that the paintings in this case were *actually* stolen; it was enough for the government to show that the conspirators conspired to transport in interstate commerce paintings which they *believed* were stolen. *United States v. Tombrello*, 666 F.2d 485 (11th Cir.1982) (by implication).

Nonetheless, an abundance of evidence exists from which the jury could have found that the paintings were in fact stolen. The conspirators stated the paintings were stolen, stated the place from which they were stolen, and handled them in a manner consistent with their statements. A person from whom similar paintings were stolen testified that he thought they were his stolen paintings. With such evidence, the jury in this case could have found that these were the same paintings stolen from the Whitney house in Palm Beach County.

After reviewing the evidence in the light most favorable to the government, and after accepting all credibility judgments and reasonable inferences that support the verdict, we hold that the evidence is sufficient for the jury to believe beyond a reasonable doubt that a conspiracy existed and that appellants, Sarro and Tortoriello, were full, voluntary, and knowing participants in the conspiracy to transport in interstate commerce two stolen paintings of a value of $5,000 or more.

We have considered the other arguments advanced by Sarro and Tortoriello, but we find them unpersuasive. After examining the entire record, the parties' briefs, and established legal precedent, we are convinced that the evidence is sufficient to support the jury's verdict and reject all of appellants' arguments to the contrary.

### D. Sufficiency of the Evidence to Sustain the Conviction of Appellant Tiedeberg

██ Appellant, Tiedeberg, contends that the evidence was insufficient to sustain his conspiracy conviction under 18 U.S.C.A. §§ 371 and 2314. We must sustain Tiedeberg's conviction if a reasonable trier of fact could find that the evidence presented at trial establishes Tiedeberg's guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). A conviction, however, must be reversed "if a reasonable jury must necessarily entertain a reasonable doubt as to the defendant's guilt." *United States v. Marx*, 635 F.2d 436, 438 (5th Cir.1981).

██ In evaluating Tiedeberg's claim, we begin with the premise that to be convicted of an unlawful conspiracy, a defendant must have knowledge of the conspiracy and must intend to join, or associate himself with the objectives of, the conspiracy. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.1979) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

██ The essential elements of a criminal conspiracy are knowledge, actual participation, and criminal intent. The government must prove each of these elements beyond a reasonable doubt. *Patterson v. United States*, 432 U.S. 197, 204–16, 97 S.Ct. 2319, 2324–2330, 53 L.Ed.2d 281 (1977).

With these observations in mind, we now consider whether a reasonable trier of fact could find that the evidence presented at trial established Tiedeberg's guilt beyond a reasonable doubt. *Bell*, 678 F.2d at 549. We first consider whether Tiedeberg had knowledge of the conspiracy. In so doing, we must view the evidence in a light most favorable to the government. *Glasser v.*

*United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### 1. Tiedeberg's Knowledge of Conspiracy

The evidence reveals that on August 4, 1982, pursuant to prior arrangements, Shapiro and Tiedeberg went to the hotel room of Agent McShane. Agent McShane invited them inside. Tiedeberg then frisked Agent McShane and searched his room. Shapiro told Tiedeberg to remain in the room. Shapiro left the room and returned shortly carrying a bag which contained the paintings in question.

Shapiro gave the paintings to Agent McShane, and McShane began to examine them. During most of the examination, Sarro, Tiedeberg, and Shapiro were standing next to McShane. At one point, Agent McShane took the paintings into the bathroom so that he could more closely examine them. Tiedeberg accompanied him into the bathroom. While in the bathroom, McShane asked Tiedeberg if they would be talking price, and Tiedeberg shrugged his shoulders.

At the end of the examination, Agent McShane reentered the hotel room and told Shapiro, Sarro, and Tiedeberg that the paintings looked very good and that they could be Rubens. McShane asked if the paintings were "hot paintings" and Shapiro stated that they were "out for two years." Tiedeberg, although present, did not participate in this conversation.

Agent McShane told the men that the paintings would have to be taken to New Jersey and eventually would be going to a customer in Central America. Shapiro reminded McShane that he could have the paintings as soon as he brought them the money. Tiedeberg remained in the room during this entire conversation.

██ After reviewing this evidence in a light most favorable to the government, we conclude that a reasonable trier of fact could find beyond a reasonable doubt that a conspiracy existed and that Tiedeberg knew of the conspiracy.

### 2. Tiedeberg's Intent to Join the Conspiracy

Next, we must determine whether a reasonable trier of fact could find beyond a reasonable doubt that Tiedeberg intended to join or associate himself with the conspiracy's objectives. *United States v. Willis*, 646 F.2d 189 (5th Cir.1981); *United States v. Malatesta*, 590 F.2d at 1381.

The evidence presented at trial established that although numerous telephone calls and meetings were held between agents and various appellants from July 28, 1982, through August 3, 1982, Tiedeberg did not participate in those conversations or meetings, nor was his name mentioned.

McShane testified that appellant, James Tortoriello, told him that Tiedeberg was his bodyguard, that he weighed 330 pounds, and that he had a black belt in karate. The agents first saw Tiedeberg on August 4, 1982, when Tiedeberg appeared with Shapiro at Agent McShane's hotel room. At that time, Tiedeberg frisked McShane and searched his hotel room. While in the bathroom examining the paintings, McShane asked Tiedeberg if they would be talking price, and Tiedeberg shrugged his shoulders.

At trial, McShane described Tiedeberg's conversation as consisting of "uh-huh, and ah-hah, and aw-haw, and yep," with the single exception of a request that McShane remove his shirt. It is clear that Tiedeberg did not indicate an intent to join the conspiracy, but rather served as a guard for the paintings at all material times.

### 3. Participation in Conspiracy

██ It is well established that close association with a co-conspirator or mere presence at the scene of a crime is insufficient evidence of knowing participation in a conspiracy. *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983). Thus, Tiedeberg's close association with appellant, Tortoriello, and his presence in the hotel room is insufficient evidence of knowing participation in a conspiracy.

■ Furthermore, we have consistently and strongly emphasized that presence followed by flight is inadequate proof of actual and knowing participation in a conspiracy. *United States v. Lopez-Ortiz*, 492 F.2d 109, 115 (5th Cir.), *cert. denied*, 419 U.S. 1052, 95 S.Ct. 630, 42 L.Ed.2d 647 (1974). It is, therefore, clear that evidence of Tiedeberg's presence in the hotel room, shrug of his shoulders, "uh-huh, uh-hah, aw-haw, yep" conversation, frisk of Agent McShane, search of the hotel room, and flight after hearing a large bang on the hotel room door, is not sufficient to sustain Tiedeberg's conspiracy conviction.

After evaluating this evidence in a light most favorable to the government, we conclude that a reasonable trier of fact could not find beyond a reasonable doubt that Tiedeberg intended to join, or associate himself with the objectives of, the conspiracy.

We, therefore, hold that the government has failed to prove beyond a reasonable doubt that Tiedeberg had the requisite criminal intent to commit the offense charged. In the absence of substantial evidence to connect Tiedeberg with the illegal agreement, and in the absence of proof beyond a reasonable doubt of each element of the offense charged, we reverse Tiedeberg's conviction. Tiedeberg may be guilty of some offense, but not conspiracy to transport stolen paintings interstate.

### E. Sarro's Speedy Trial

■ Appellant, Robert Sarro, argues that he was denied his statutory right to a speedy trial following his indictment. We disagree. The Speedy Trial Act, 18 U.S.C.A. § 3161(c)(1) (West Supp.1983), provides, in pertinent part, that:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within *seventy days* from the filing date (and making public) of the information or indictment or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. [Emphasis added.]

Not every day between arraignment or indictment and trial is counted within the seventy-day period. Title 18 U.S.C.A. § 3161(h) (West Supp.1983) sets forth various "periods of delay that shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence."

Section 3161(h)(1)(F) excludes: "Delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion...."

The record reveals that the original indictment was filed against Sarro and his co-defendants on August 11, 1982, and a superseding indictment was filed against them on September 22, 1982. Sometime between August 27, 1982, and December 28, 1982, numerous pretrial motions were filed by Sarro's co-defendants and disposed of by the court.

■ Despite the fact that Sarro did not file any pretrial motions, the aforementioned time periods are excludable as to him as well as to his co-defendants. *See United States v. Varella*, 692 F.2d 1352 (11th Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); *United States v. Edwards*, 627 F.2d 460, 461 (D.C.Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980).

Sarro's speedy trial issue is controlled by this court's decision in *Varella*. In that case, this court held that the Speedy Trial Act excludes a reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run, and no motion for severance has been granted. Because Sarro was joined for trial with co-defendants Mark Tortoriello, James Tortoriello, Shapiro, and Tiedeberg, and the time for trial for these co-defendants had not run, and no motion for severance had been granted by the court, *Varella* covers this case.

Trial date was set for January 22, 1983. Prior to that date, both James Tortoriello and Shapiro requested a continuance of the trial date. Shapiro needed a continuance because his attorney was involved in another trial which was scheduled to begin January 22, 1983, and was estimated to last sixty to seventy days. Tortoriello's request was based on the recent death of his brother and the potential effect this trial would have on his parents' already failing health. The district court continued the trial until February 22, 1983.

■ A district court is given discretion to decide when and whether a continuance is appropriate. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). Title 18 U.S.C.A. § 3161(h)(8)(A) (West Supp.1983) empowers the judge to grant a continuance if he feels the "ends of justice" so require. *United States v. Edwards*, 627 F.2d 460 (D.C.Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980). Section 3161(h)(8)(A) further provides that any delay resulting from such a continuance shall be excluded from the computation of trial days. *Edwards*, 627 F.2d at 461.

■ Considering the record as a whole, we conclude that the district court's grant of the two continuances was not an abuse of discretion and does not require a reversal. We further hold that Sarro was brought to trial within the requisite time and, therefore, was not deprived of his statutory right to a speedy trial.

### Conclusion

In sum, we hold that the district court properly admitted the tape recordings into evidence; that sufficient evidence existed to prove beyond a reasonable doubt the guilt of Tortoriello and Sarro; that the evidence is insufficient to sustain Tiedeberg's conviction; and that Sarro was not denied his statutory right to a speedy trial.

Accordingly, we affirm the convictions of Tortoriello and Sarro, and we reverse the conviction of Tiedeberg.

**AFFIRMED IN PART, REVERSED IN PART.**

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I concur in all but the majority's conclusion that the evidence was insufficient to convict Tiedeberg of conspiracy to transport the paintings in interstate commerce, knowing them to have been stolen. I believe that, applying the standard of *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), a reasonable trier of fact could have found that the evidence established Tiedeberg's guilt beyond a reasonable doubt.

The majority finds the evidence sufficient to show that the conspiracy existed and that Tiedeberg knew of it; the majority only finds insufficient the evidence that Tiedeberg intentionally joined the conspiracy. My disagreement, then, only extends to this narrow issue.

As the majority has noted, we are required to read the evidence in the light most favorable to the government. A defendant cannot escape criminal liability on the ground that he did not join in the conspiracy until well after its inception, or that he played only a minor role in the scheme. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

Tiedeberg searched the FBI agent who was to examine the paintings, and searched the agent's hotel room. When the agent asked Tiedeberg whether the agent would be seeing the paintings, Tiedeberg nodded yes. During the group conversation about details of the conspiracy that took place after the agent had examined the paintings, Tiedeberg sat in a five- to six-foot semicircle with the other coconspirators. He did not stand off by himself, ignoring the conversation. As everyone was leaving the room, Shapiro asked Tiedeberg to stay and guard the paintings. Tiedeberg nodded yes.

The jury could infer from those actions that Tiedeberg had intentionally joined the conspiracy. Searching the room and guarding the paintings may have been only a minor part of the conspiracy, but they certainly were acts in furtherance of the conspiracy. These acts, considered with Tiedeberg's assent to the agent's question about seeing the paintings and his presence in the conversational group, yielded a reasonable inference that Tiedeberg was a party. The jury was not bound to believe any of Tiedeberg's testimony that he was simply a partially deaf bodyguard naively obeying his employer's orders. Because a reasonable trier of fact could have found that the evidence established Tiedeberg's joining of the conspiracy beyond a reasonable doubt, I would affirm his conspiracy conviction.